One from the PTO and one from a district court. And we've got a case from the Claims Court that's being submitted in the briefs and will not be argued. First case is Apotex v. Wyeth, 2015-1871. Mr. Melendez. Good morning, Your Honors. May it please the Court. The claimed three-part composition here is truly the paradigm of obviousness under KSR, a third-generation antibiotic, tycocycline, combined with a well-known sugar and a well-known acid. And the resolution of this case is as simple as the purported invention here. That's because a case exactly like this one was already decided by this court after the PTAB's decision, namely the Senju v. Lupin case. But isn't this a case of combination of references, and you need motivation to combine, and that's a question of fact, and therefore we defer to the PTO? I agree, Your Honor. A motivation to combine is certainly a question of fact. But the problem here, and this is really one of the main bases for the error that we're asserting, is that the Board never addressed a number of our key motivation arguments below because it was focusing on the issue of epimerization and the inventor's problem that it was trying to solve, namely minimizing epimerization. We have actually two distinct substitution-related arguments. The red brief says at pages 37-38 that in your reply brief you argued epimeric stability for the first time. And they argue that – make a standard waiver argument because of that. What's your response? Let me put it this way. Was this argument raised prior to the reply brief, and if so, where is it in the record? Which argument specifically, Your Honor? The motivations to substitute? In its reply brief, Epitex argued that the Board need not limit its analysis to epimeric stability but instead could find the 828 patent obvious if the person having ordinary skill in the art would have substituted tygocine for mining of cyclin in the CN-550 compositions for any reason. Yet Epitex never in fact asserted a reason for using lactose with tygocycline other than to reduce epimerization. Yes, we did in fact raise that argument below, and in fact, if you turn to the – 100 percent, Your Honor. And in fact, if you turn to page A160 of the appendix, what you have in paragraph 84 is our argument in the declaration of Dr. Nelson. And if you please turn to paragraph 84 where it says a person of ordinary skill in the art in 2005 would find that – substitution for minocycline in the lyophilized formulation, blah, blah, blah. Because the 82 patent states that it was known that tygocycline, quote, has been shown to work where other antibiotics have failed, end quote, and it has been active against methicillin-resistant staphylococcus, et cetera. And in fact, if you go to heading one there, it says tygocycline is an obvious substitution for minocycline. All right. Thank you. Yes, Your Honor. So in Senju, this court – Let me ask why I have to discuss that too. Please. Thank you. So they're on. In Senju, this court affirmed a finding of obvious involving a simple substitution of an early generation antibiotic with an improved next generation antibiotic in a prior art formulation. And that's exactly what we have in this case. Here, the Chinese 550 application discloses the second generation antibiotic minocycline, lactose, and hydrochloric acid. Why its inventors admit in the background section of the 828 patent that tygocycline is, quote, a chemical analog of minocycline, so they're very structurally similar, and an improved antibiotic that, quote, has been shown to work where other antibiotics have failed, end quote, which is the quote we just referred to that Dr. Nelson cited. Senju dictates that under these facts, a person of ordinary skill in the art would have been motivated to make the simple substitution of generational drugs, thereby rendering the claims invalid as obvious. While this case can be decided on the facts of Senju alone – How can this case be decided based on another case's facts? Look, I get your argument. It seems to me you had a very strong obviousness case here. But the board rejected it and found no motivation to combine. And what do we have to do to find substantial evidence or a lack of substantial evidence? Because particularly when we're talking about a lack of motivation to combine, that's kind of negative evidence. I mean, basically, don't we just look to the board's reasoning and say, is there anything in the record that so substantially contradicts it that we would disagree? And keeping in mind that they said they didn't believe Dr. Nelson's evidence. There are two parts to that, Your Honor. The first of which is that we are very sensitive to the issue of standard review and the issue of substantial evidence. That's why our brief is limited to only legal errors and specifically the legal errors that the board committed in not addressing particular motivation to combine arguments. So we're not trying to argue – I get that, but I don't know that that's – even if that's true, and I don't necessarily think it is, that that's still enough to – we're still talking about a factual finding. They found no motivation to combine. As long as that's supported by substantial evidence, then we have to affirm, don't we? I don't believe so, Your Honor, because under, for example, this court's Cutsforth decision, it's not sufficient for the board to simply lay out the party's arguments and then provide a broad sweeping generalized conclusion, which is exactly what happened here. There were a number of motivations that we raised. In some cases, the board recited them but then provided no analysis, which means that that does not enable this court to have anything to actually review. And so if there's nothing to review, then how can the court do it – how can this court do its job? And that's why Cutsforth is so clear about that, which is that the PTAB in this case needs to do its analysis and show why it's reasoning the way it is. And it didn't do that in a number of cases due to the legal errors it made, reading limitations into the claims that aren't there. And then focusing only on the problem that the inventors were addressing, namely reducing epimerization. Mr. Melendi, one can start with the Chinese reference, which teaches minus cycline plus lactose and HCL. And the question is whether to substitute tigercycline for the minocycline. The patent we have before us says epimerization is a more serious problem with tigercycline than with other tetracyclines, such as minocycline. So doesn't that lead away from substituting tigercycline? I don't believe it does, Your Honor, because we have to keep in mind that KSR has a very broad general test that's flexible with respect to proving obviousness. And you don't have to just focus on the problem that the inventors were facing with respect to epimerization. There may be other reasons to substitute, and in fact, this issue gives us a very compelling one, namely the structural similarity of these second-generation versus third-generation antibiotics. Also, we have the plain structural similarity of the two molecules side by side. Your Honor will note that there's only a difference in the C9 position. So that alone would give someone a motivation to simply swap out tigercycline for minocycline in that Chinese reference. So while we believe that this case can be decided on Senju alone, I'd like to briefly discuss the two legal errors that we've discussed in our briefs. First, the Board erred in importing an epimeric stability limitation into the composition claims in violation of longstanding precedent, including Senju. This caused the Board to discredit Apotex's lead reference, the Chinese 550 application, and one of its secondary references, Palachek, for not teaching a nonexistent limitation, which is exactly what happened in Senju. Second, the Board failed to consider motivations to substitute or combine beyond the problem the patentee was trying to solve, that is, minimizing epimerization, which it describes in the patent. This error violates KSR, Senju, and Alcon, among many other cases, which make clear that any reason can serve as a motivation, not just the problem that the patentee was trying to solve. And with respect to motivation to substitute minocycline for tigacycline, we have two motivations that the Board did not analyze. You mean the reverse. I apologize. Tigacycline for minocycline. Correct, exactly. Substituting tigacycline for minocycline. So with respect to that substitution of tigacycline for minocycline, the Board disregarded two motivations, the first of which was the Senju-improved antibiotic-type motivation, and then the second motivation has to do with just simply that structural similarity and the only difference at the C9 position for tigacycline. And the Board also disregarded two motivations to combine to optimize the pH ranges. The first of those is the well-known fact that oxidation and epimerization both plague tigacyclines, tetracyclines at different pH levels, and the inventors admit in the background section of the patent that that was the case. Secondly, the fact that the recited pH ranges were commonly employed in conventional injection solutions. And Wyeth doesn't even contest that the Board disregarded these motivations, relying on a mere procedural argument as its only defense against those. So if there are no further questions, I'll reserve the rest of my time for rebuttal. We will do that, Mr. Melendo. Mr. Burrell. Good morning, Your Honor. May it please the Court. If I may start perhaps with Judge Wallach's question. Are you satisfied that A116 adequately raises the issue? No, I'm not. Respectfully, my opponent read from paragraph 84 of the declaration of Dr. Nelson, its expert, which addresses the issue that tigacycline was known to succeed where other tetracycline antibiotics had been known to fail, and he suggests that this is some motivation separate and apart from epimerization, which was advanced below by apotex. He didn't read the next paragraph, paragraph 85 of Dr. Nelson's declaration, which ends, a person of ordinary skill in the art would understand that minocycline and tigacycline undergo C4 epimerization in a solution at a pH of 2 to 3.5, as discussed above. The following paragraph, paragraph 86, again addresses epimerization. The idea that there was a motivation separate and apart from any epimerization argument that actually was presented by apotex as a distinct argument below simply isn't true. But let's leave that aside for a moment because the argument that we heard today and that we heard in the briefs from apotex is that the board somehow failed to address this motivation argument. We heard a few motivation arguments just now. Well, the board is responding to what it says. It says that it's responding to what was raised. Absolutely, Your Honor. And, in fact, they went beyond that. You heard paragraph 84 relied on just now by apotex from Dr. Nelson's declaration. If you look on page 12 of the board's opinion, that very paragraph is cited, and it's block quoted. And the board, after reciting that paragraph, basically rejects petitioner apotex and Dr. Nelson's argument, basically saying that neither petitioner nor Dr. Nelson provides information demonstrating that a person of ordinary skill would have relied on this therapeutic effectiveness of tigacycline. It's not that the board didn't address apotex's argument. The board did address apotex's argument and found it wanting. They simply were not convinced by the only evidence that apotex presented below, the declaration of Dr. Nelson, whom the board found non-credible and guided by hindsight after review of the record. Mr. Burrell, getting down to basics, you've got a composition here, including minocycline, and tigacycline is a very similar tetracycline compound. Why isn't it just plain obvious to substitute one for the other? Well, in the first instance, there was no finding below, nor is it correct, that tigacycline is very similar structurally to minocycline. They differ at the nine position. Really? You've got this tetracycline stuff? They have the same core, and it's an analog. That doesn't mean they're structurally similar, and it doesn't mean that whatever properties are disclosed with respect to minocycline in the prior 550 patent would have been expected to accrue for tigacycline in a different formulation if one made the substitution. In fact, the board addressed that very argument at page 14 of its opinion, finding that a person of skill would not have expected all of the benefits of the minocycline formulation in CN-550, stability against light, heat, water, oxygen, to be present in a tigacycline formulation. They made that factual finding, which respectfully is not even challenged here on appeal. The idea that one would just assume that everything that is true of minocycline in the formulation of CN-550 would be true of tigacycline simply is refuted by the record in this case and the board's findings below. To take just one example, stability against oxygen. Dr. Mitcher, our expert, explained in his declaration at A1728 to A1732 that the way these compounds relate to oxidation, that is, breakdown as a result of oxygen, is quite different as a result of that structural difference at the C9 position. Moreover, there's an entirely different pathway of breakdown that's addressed by Dr. Mitcher at page A1640 of his declaration and further explained at oral argument at A10253 to A10254 that says that there is a breakdown by something called the Maillard reaction as a result of the amine, as a result of the substituent at the 9 position of tigacycline that wouldn't be present for minocycline. So the notion that one could simply substitute back and forth tigacycline for minocycline because they may look similar to a layman on a piece of paper is simply not reflected in the record. Dr. Nelson, Apotex's own expert, agreed at A2042 that with respect to breakdown from oxygen, minocycline and tigacycline would be different in terms of the pH at which this breakdown would occur. Again, that factual record is what the board relied on in reaching the conclusion at A14 that Apotex's argument presented in their petition at page 39, A85, is simply incorrect that a person of ordinary skill would not have expected the same advantages from CN550 to accrue to a formulation of tigacycline. And that's where we get to the primary case on which Apotex relies, Senju, in which it attempts to persuade the court to decide this case in a sort of obviousness by proxy way that because the claims in Senju on that were obvious, the claims here are obvious as well. That's not how the obvious inquiry works. And the record in Senju, I submit, is diametrically opposed to the record in factual findings in this case. To take just one example, the district court in Senju, which, by the way, found obviousness, and therefore this court's review was a substantial evidence of a finding of motivation of obviousness, the court made extensive factual findings in its initial 2010 opinion, including that a person of ordinary skill in that art would have expected the new compound called gadifloxacin to be formulated in the same way as the prior art quinolones of the 470 of the 456 patent that had EDTA. In other words, there was a factual finding by the district court in that case that there would have been an expectation and motivation when moving from lomafloxacin or norfloxacin in the prior art in Senju to gadifloxacin in the claims that it would work the same way, that you would have the same advantages. In fact, there was a clear factual finding by the district court at page 421 of its opinion that said a person of skill would have expected beneficial properties from EDTA to accrue to all of the quinolones, including the new quinolone gadifloxacin at issue in that case. In this case, one has precisely the opposite factual finding by the board. That is, that when one makes the substitution, a person of ordinary skill would not have expected the benefits of the prior art here, CN550, to accrue. Moreover, there were a host of other factual findings in Senju, including the fact that the excipient there, EDTA, was a standard excipient in this field, in the quinolone field. It had been used with norfloxacin, pfloxacin, enoxacin, lomafloxacin, ciprofloxacin, and a host of others that I'm likely forgetting. Here, the record is precisely the opposite. Lactose was not a standard excipient in the tetracycline field. And in fact, the evidence in the record, A1673-1675, and A1754-1758 from Dr. Mitcher, explains that the actual formulations that a person of ordinary skill would have looked to is not the CN550 formulation with lactose, but rather a host of formulations that a person of ordinary skill would have looked to instead and found better benefits, such as the 060 patent found at A2489, the 528 patent found at A2495, the 248 patent found at A2662, and the Creelguard article at A272. Appetex ignores all of this evidence completely because it does not and cannot fight the proposition that the board's finding that a person of skill wouldn't have been motivated to make this substitution is supported by substantial evidence. It's not only supported by substantial evidence. It is the only finding that the board could have made on the record below, and it's not even challenged by Appetex in this court. If I could just address briefly the pH motivation argument that counsel referred to as well, I just want to be clear. We're not only fighting that motivation on the basis of some procedural impropriety. Rather, the motivation does not work to end up at the claims. The question in Senju and every other case is whether, if one combined the references and had a motivation to do that, would the claim result? The pH motivations that are advanced here on appeal by Appetex never lead you to taiga cycling. The idea that one would have wanted to use a pH of 4 to 5, which, by the way, was not supported by the record below, which I'll get to in a second, doesn't provide a motivation to use taiga cycling rather than minus cycling. That is what is missing from Appetex's case. In all of the references they rely on, CN-550, Pobolchek, and Naggar, there's no disclosure of taiga cycling, no teaching of taiga cycling or its use or its properties. Counsel stands up here and says, oh, it's all the same. We can just substitute taiga cycling for minus cycling and pretend there's no difference. But the board found, at 8-10, that the absence of any teaching of taiga cycling in the record or its properties or use was devastating for Appetex's case, and they can't overcome it here. So they have a series of references which they attempt to combine, including for pH reasons, but again, there's no taiga cycling. There's no reason to substitute taiga cycling for minus cycling, and the reasons they advanced were addressed by the court, not just epimerization, but all other reasons were addressed at 8-10, 8-12, 8-14, and the board made factual findings that, again, are not challenged on appeal and, in any event, are clearly supported by substantial evidence. If the court has further questions, I'm happy to address them otherwise. Thank you, Mr. Burrell and Mr. Melinda. There's some rebuttal time. Your Honors, I'd just like to address a few points that Mr. Burrell raised, the first of which is that he argued that, really, this Senju argument is linked in some way to the epimerization argument, and that's simply false. These are two completely distinct arguments. They're completely separate, and basically he has to argue that Senju and the structural similarity arguments are somehow intertwined with epimerization because if he doesn't make that argument, then this has to go back, because it's clear from the board's very conclusory opinion that the board never addressed issues relating to the Senju improvement type argument or structural similarity. Also, with respect to the PTAB reciting certain arguments in a block quote, well, first of all, setting forth an argument in a block quote is not the same thing as analyzing it, and what's notably absent from the court's opinion is actual analysis with respect to the Senju type argument or the substitution argument. Also, with respect to Judge Wallach's question about raising the issue of substitution, I also just wanted to point, Your Honor, to pages 31 and 32 of the petition, which are cited at A77 through A78 in the appendix. So how is it not analysis at A12, where following paragraph 84, they begin by saying, Dr. Nelson does not explain, however, why the knowledge that Tajik cycling is effective, quote, where other enigmatics have failed, close quote, would lead a person having ordinary skill in the art to substitute and so on. That is analysis, is it not? It's faulty analysis, and the reason why is because in Senju... You said that there was no analysis. Now you're saying that nonexistent analysis is faulty. You see my problem with your argument. Okay, there really is an analysis when they say that Dr. Nelson gave any sort of proof as to why that would be true, because under Senju, there's nothing more that Dr. Nelson has to do. Under Senju, what you had in that case was an understanding in the art that there was an improved antibiotic that was replacing a prior-generation antibiotic, and the fact that that was known in the art was enough for that motivation to substitute. Here we have something even better than that. What we have is an actual statement within the patent, an admission by the inventors, that titocycline is an improved antibiotic relative to minocycline. So we actually have something even better than Senju did, and the board ignored that. The board did not address that particular issue. Dr. Nelson did everything he had to do, which was point to that statement, and beyond that, that's it. So under Senju, to the extent the board addressed that with that statement, that's a legal error, and to the extent it didn't address it, it's a legal error, due to the fact that it was focusing solely on the argument relating to epimerization. I guess one of the other arguments he says is that the Senju case is diametrically opposed to this one. I have to be honest with you, Your Honors, I find that argument breathtaking. So just to break this down, the primary issue is why one would be motivated to substitute an old antibiotic for a structurally similar one, and that's exactly what Senju was about. And in that case, the motivation was known in the art that gatafloxacin was an improved antibiotic. Here, the inventors themselves, as I just said, admit that tigacycline was an improved antibiotic, so we have something even better. Then the secondary question... The problem is you're just arguing all facts, though. I mean, just the fact that there's one case dealing with antibiotics, there's another case dealing with antibiotics, that they both involve improved antibiotics doesn't do anything to the fact that the chemical arts can be very unpredictable. So a third-generation antibiotic may react very differently than the second generation, and it's your burden to show that a person of ordinary skill would have been motivated to combine them. And if the board disagrees with you and rejects your evidence in favor of your friend's evidence, then I don't see how we can, as a matter of law, say that was incorrect. But, Your Honor, the problem is that in a number of the cases that we pointed out in our briefing, they just never did the analysis. There's really nothing for you to review because all the board really did was focus on the issue of epimerization. It discounted our references, it discounted what Dr. Nelson had to say, because if they didn't disclose the epimerization, we'll put them aside. Let's assume we disagree with you about them disregarding your references, and we find enough in the opinion to think that they've carefully considered this case, they've considered all of your arguments, even if they didn't write extensively, they've rejected them on the facts. Aren't we in a substantial evidence-review land then, and then don't you have a really difficult problem? I don't think we can ignore the fact that the board simply gave you nothing to review to assess substantial evidence for. The board simply didn't do that analysis for you to take the bull by the horns and do the analysis. Unfortunately, all the board did was provide a sweeping conclusory statement, which is what cuts forth counsels against the board doing. So I guess just to conclude, what we have here is a SendU case. We have a very simple substitution that provides ample motivation based on an improved antibiotic being substituted for an old one, and we've also provided the other motivations relating to pH as well as structural similarity in our briefing. Thank you, Mr. Melinda. Council, the case is submitted.